IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-254

Filed 17 September 2024

Mecklenburg County, No. 2021 JT 393

In the matter of:

B.A.J.

Appeal by respondent-mother and respondent-father from order entered 26 October 2023 by Judge Faith A. Fickling-Alvarez in Mecklenburg County District Court. Heard in the Court of Appeals 28 August 2024.

> *Mecklenburg County Attorney's Office, by Senior Associate Attorney Kristina A. Graham, for Petitioner-Appellee Mecklenburg County Department of Social Services.*
>
> *Administrative Office of the Courts, by Brittany T. McKinney, for Guardian ad Litem.*
>
> *Emily Sutton Dezio for Respondent-Appellant Mother.*
>
> *Peter Wood for Respondent-Appellant Father.*

COLLINS, Judge.

Mother and Father appeal the termination of their parental rights to their child, Billy.[1] Mother argues that some of the adjudicatory findings of fact were unsupported by evidence, the court's remaining findings were insufficient to support the court's conclusions that grounds existed to terminate her parental rights, and the

---

[1] We use a pseudonym to protect the identity of the minor child. *See* N.C. R. App. P. 42.

court abused its discretion when it determined that termination of her parental rights was in Billy's best interest. Father argues only that the trial court abused its discretion when it determined that termination of his parental rights was in Billy's best interest. For the reasons below, we affirm.

## I. Background

Mother and Father are the biological parents of Billy. Billy was born in 2021 and has two older sisters, Stephanie and Sarah, who are Mother's biological daughters but who have different biological fathers than Billy.[2] The three children came into Mecklenburg County Department of Social Services ("DSS") custody on 16 September 2021 when DSS received a report alleging physical abuse of Sarah. The report alleged that Mother and Father hit Sarah with belts, cords, and shoes; "tie[d] up [Sarah's] hands and feet with sheets and t-shirts and . . . and h[u]ng her from a door"; taped her mouth shut; yelled at her; and made her do squats and push-ups; and that Mother told Stephanie and Sarah not to tell anyone about these things. The Charlotte-Mecklenburg Police Department ("CMPD") executed a search warrant on the house and located items that corroborated the report. Additionally, CMPD found a pit bull locked in a cupboard under the kitchen sink without access to food or water, a broken bed frame in the children's bedroom with dried and fresh feces smeared on the bed frame, and a smashed tv on top of the broken bed frame in the children's

---

[2] Stephanie and Sarah are not subjects of this appeal.

room. Sarah was taken to the emergency room, where doctors found she had "multiple injuries in various stages of healing" and these injuries were "non-accidental." Mother admitted to causing Sarah's injuries with a belt; she was arrested and charged with Felony Child Abuse.

DSS filed a petition on 20 September 2021 alleging that Sarah was abused and neglected and that Stephanie and Billy were neglected, and DSS took non-secure custody of the children. The initial adjudication and disposition hearings took place in February and March 2022, and the trial court adjudicated Billy a neglected juvenile. At disposition, the trial court did not order reunification efforts with the parents because it found that Mother and Father "committed or encouraged the commission of . . . chronic physical or emotional abuse of [Sarah] and torture of [Sarah]" and that Billy was "present in the home and observed to some degree the torture and physical abuse imposed upon [Sarah] by [parents]." The trial court adopted a primary plan of adoption for Billy with a secondary plan of guardianship but permitted the possibility of supervised visitation between the parents and Billy for two hours twice per week.

The trial court held a permanency planning hearing over 22 April 2022, 28 September 2022, and 6 October 2022. The trial court found that the parents were not making adequate progress under the plan and that they were not "actively participating in or cooperating with the plan, [DSS], and GAL." The trial court found that

Mother and Father [] are acting in a manner inconsistent with the health and safety of the juveniles. . . .

. . . .

Both Mother and Father [] refused to answer questions during this proceeding in reliance on the 5th amendment privilege. These questions were related to the acts of torture and physical abuse that they imposed on [Sarah], and the injurious consequences of neglect that they imposed on [Stephanie] and [Billy]. Pursuant to case law, the [c]ourt draws an adverse inference against Mother and Father [], but the [c]ourt does not solely use these adverse inferences to support the continued cessation of reasonable efforts, but in conjunction with all the other findings the [c]ourt has made in this order.

If Mother and Father [] cannot admit and/or recognize the abuse and neglect they imposed on the juveniles, they are not able to demonstrate to the Court that they understand the impact on the juveniles and they are not able to demonstrate they have rehabilitated themselves and the circumstances that caused the abuse and neglect.

Mother and Father [] have had another child and they are residing together. Both of them have expressed an intent to reunify with all the children as one family unit. This intent demonstrates that Mother is not considering the best interest of the juveniles [Stephanie] and [Sarah], as she intends them to reunify with her significant other who this [c]ourt has found committed acts of physical and emotional abuse upon them, including torture upon [Sarah].

The trial court then found that DSS "appropriately ruled out" Father's mother as a possible relative placement based on concerns that she "would fail to protect the juveniles and/or would fail to follow court orders" as she had "previously allowed unauthorized contact between [Billy] and Mother and Father" against the trial court's

order. Father then identified his brother as a potential relative placement for Billy and the trial court ordered DSS to assess Father's brother for possible placement.

The trial court held another permanency planning hearing on 30 August 2023 and 7 September 2023, and it again found that the parents were not making adequate progress and that the issues that brought Billy into custody had not been resolved. The trial court found that Mother had attended classes and mental health treatment, but she was "involved in another domestic violence incident with [Father] and has continued to engage with him thereafter." During the domestic violence incident, Father struck Mother in the face, grabbed her neck and squeezed, and hit her on the side of her head with a gun. Later that same night, Mother's home was "shot into at least eight times." The trial court found that Mother was "unsure whether she will, or even wants to" file for a domestic violence protective order ("DVPO") against Father and that Father has been calling Mother from the jail and "[Mother] has accepted and engaged in these phone calls with [Father]." Additionally, the court found that Mother testified that she had been "fully honest" with her therapist but still would not discuss in therapy the "heinous, cruel, and inappropriate actions of abuse and torture" that resulted in Billy entering DSS custody. The trial court again found that Father's mother was appropriately ruled out by DSS as a possible relative placement for Billy, and it found that Father's brother had three drug-related felony charges and that DSS ruled him out as a possible relative placement.

On 11 January 2023, DSS filed a motion to terminate the parents' parental

rights on the grounds of neglect, willful failure to make reasonable progress in correcting the conditions which led to removal of the juvenile, and willful failure to pay a reasonable portion of the cost of care of the juvenile. The termination of parental rights hearing ("TPR hearing") took place on 20 and 26 September 2023. DSS did not proceed on the willful failure to pay a reasonable portion of the cost of care ground. During the hearing, the trial court took judicial notice of the underlying orders without objection from any party, received live testimony from a social worker employed with DSS, and admitted twenty exhibits into evidence. Mother did not testify or call any witnesses, and she offered exhibits that were not properly admitted as conceded by her attorney during the hearing. Father did not testify but called his mother and brother as witnesses.

After considering all the evidence, the trial court terminated the parents' parental rights to Billy on the grounds of neglect and willful failure to make reasonable progress in correcting the conditions that led to Billy's removal. The trial court proceeded to the dispositional phase and concluded that it was in Billy's best interest for the parents' rights to be terminated.

## II. Discussion

Mother argues that some of the adjudicatory findings of fact were unsupported by evidence, the court's remaining findings were insufficient to support the court's conclusions that grounds existed to terminate her parental rights, and the court abused its discretion when it determined that termination of her parental rights was

in Billy's best interest. Father argues only that the trial court abused its discretion when it determined that termination of his parental rights was in Billy's best interest.

## A. Standard of Review

"Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In re Z.A.M.*, 374 N.C. 88, 94, 839 S.E.2d 792, 796-97 (2020) (citation omitted). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5-6, 832 S.E.2d 698, 700 (2019) (citing N.C. Gen. Stat. § 7B-1109(f)). We review a trial court's adjudication of grounds to terminate parental rights "to determine whether the findings are supported by clear, cogent[,] and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392, 831 S.E.2d 49, 52 (2019) (quotation marks and citations omitted). Unchallenged findings of fact are "deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) (citations omitted). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019) (citation omitted).

If the trial court concludes that there are grounds to terminate parental rights, "the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re*

*D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citations omitted). We review the trial court's dispositional findings of fact to determine whether they are supported by competent evidence. *In re K.N.K.*, 374 N.C. 50, 57, 839 S.E.2d 735, 740 (2020) (citations omitted). Unchallenged dispositional findings are binding on appeal. *In re Z.L.W.*, 372 N.C. 432, 437, 831 S.E.2d 62, 65 (2019) (citation omitted). A trial court's best interests determination "is reviewed solely for abuse of discretion." *In re A.U.D.*, 373 N.C. at 6, 832 S.E.2d at 700 (citation omitted).

## B. Mother's Appeal

### 1. *Judicial Notice of Prior Orders*

Mother first argues that adjudicatory findings 11, 15, 16, and 18 are unsupported by the evidence because the trial court "impermissibly relied on its prior findings in the dispositional and permanency planning hearings" that were "found under a lower standard of proof than the clear, cogent, and convincing evidence standard" of those findings made at the TPR hearing. Mother claims that the trial court "simply adopted the findings" and "that there was not sufficient evidence to support these findings[.]"

"A trial court may take judicial notice of findings of fact made in prior orders, even when those findings are based on a lower evidentiary standard because where a judge sits without a jury, the trial court is presumed to have disregarded any incompetent evidence and relied upon the competent evidence." *In re T.N.H.*, 372 N.C. at 410, 831 S.E.2d at 60 (citation omitted). "[T]he trial court may not rely solely

on prior court orders and reports but must receive some oral testimony at the hearing and make an independent determination regarding the evidence presented." *Id.*

Here, in addition to the trial court taking judicial notice of prior orders, the social worker assigned to the case testified at the TPR hearing regarding Mother's past and present lack of progress on her case plan and the progression of the case since Billy entered into DSS custody and through the TPR hearing. The trial court also admitted into evidence without objection the GAL report and twenty exhibits that were relevant to Billy's entrance into DSS custody and the progression of the case through the TPR hearing. Additionally, adjudicatory findings of fact 21, 23, and 24 all pertain to Mother's circumstances at the time of the TPR hearing. The challenged findings of fact are based, at least in part, on live testimony and other exhibit evidence provided at the TPR hearing, and the challenged findings are thus "sufficient to demonstrate that the trial court made an independent determination regarding the evidence presented." *Id.* at 410, 831 S.E.2d at 61. We conclude that Mother's argument is without merit.

### 2. *Competency of the Evidence*

Mother next argues that portions of adjudicatory findings 20, 23, and 24 pertaining to Mother's honesty in therapy are not supported because "the trial court relied on incompetent evidence in [its] findings regarding whether or not [Mother] was honest with her therapist." Mother argues that the social worker's testimony, based upon the social worker's recollection of Mother's testimony from a prior

permanency planning hearing in August 2023 ("the August 2023 hearing"), is incompetent evidence because "[t]he social worker is merely reciting a recollection of [Mother's] testimony from a prior hearing."

Mother cites to *Hensey v. Hennessy*, 201 N.C. App. 56, 685 S.E.2d 541 (2009), for the proposition that, because a trial court "does not have the authority to issue an order based solely upon the court's own personal memory of another entirely separate proceeding," the social worker here was not permitted to testify as to her recollection of Mother's testimony at a prior hearing. Mother's reliance is misplaced.

In *Hensey*, the trial court issued an order after it did not hear "any evidence" at a civil hearing and instead based its order upon the trial court's personal memory of a prior criminal proceeding. *Id.* at 67-68, 685 S.E.2d at 549. Our Court examined the appellate record and concluded that the

> plaintiff presented absolutely *no* evidence before the trial court. The most troubling aspect of this case is that the transcript of the hearing reveals that the trial judge granted the order without hearing any evidence because he "heard it on the criminal end." In other words, because he was the judge presiding over the criminal case in which charges stemming from this incident were brought against defendant, the trial judge concluded that he need not hear any evidence regarding this civil matter.
>
> . . . .
>
> Although we appreciate the trial court's concern for judicial economy, a judge's own personal memory is not evidence. The trial court does not have authority to issue an order based solely upon the court's own personal memory of another entirely separate proceeding, and it should be

> obvious that the evidence which must be taken orally in open court must be taken *in the case which is at bar*, not in a separate case which was tried before the same judge.

*Id.* (quotation marks and citations omitted).

Here, the social worker testified about her personal recollections of Mother's statements at the August 2023 hearing; this was not an instance where the trial court "issued an order based upon the court's own personal memory." *Id.* at 67, 201 N.C. App. at 549. The social worker testified that she was present in court at the August 2023 hearing and heard Mother's testimony during that hearing. She then testified without objection as to her personal memories of Mother's testimony about her engagement in therapy. *Hensey* is thus inapplicable here.

Additionally, Mother concedes that her testimony at the August 2023 hearing is "a statement by a party and would pass the hearsay exception and be admissible as evidence." Mother argues, however, that "the social worker's recollection or prior testimony should not be afforded sufficient weight to terminate [Mother's] parental rights." Mother's testimony at the August 2023 hearing is admissible and we cannot re-examine the weight the trial court afforded to the social worker's testimony. *See In re J.A.M.*, 372 N.C. 1, 11, 822 S.E.2d 693, 700 (2019) (explaining that the trial court is "uniquely situated" to "assess[] the demeanor and credibility of witnesses" and, as such, "appellate courts may not reweigh the underlying evidence presented at trial"); *see also In re J.I.G.*, 380 N.C. 747, 754, 869 S.E.2d 710, 715 (2022) (refusing to review the trial court's assignment of weight and credibility to testimony, stating

that the determination "resides solely in the purview of the trial court").

When the social worker was questioned about Mother's engagement in therapy, the social worker testified:

> Q: [Mother] has participated in mental health services and is in individual therapy; is that correct?
>
> [Social Worker]: Yes.
>
> Q: And at the [hearing] which happened on August 30, 2023, Mother did testify that she felt she has been fully honest with her therapist as to why the children are in [DSS] custody, correct?
>
> [Social Worker]: Yes.
>
> Q: But then, further within that same hearing, Mother further testified that she did not admit to her therapist committing physical abuse against [Sarah], correct?
>
> [Social Worker]: Yes.
>
> Q: To your knowledge, has Mother discussed with her therapist anything surrounding physical abuse, emotional abuse, torture, or inappropriate physical discipline of her children?
>
> [Social Worker]: No, she has not.
>
> Q: At that August 30, 2023, hearing, [Mother] also testified that she did discuss the domestic violence incident from July 5th with her therapist, correct?
>
> [Social Worker]: Yes.
>
> Q: But then she further testified at that same hearing that [Mother] does not discuss [Father] . . . with her therapist, correct?
>
> [Social Worker]: Yes.
>
> Q: So you would agree that [Mother] is not being fully honest and transparent with her therapist about the facts and circumstances of why her children are in [DSS] custody, correct?

[Social Worker]: Yes.

This testimony is clear, cogent, and convincing evidence that Mother was not honest with her therapist. The social worker further testified that Mother "being forthcoming with her therapist in regard to her behavior and what led to her children entering [DSS] custody" would demonstrate to DSS Mother's acceptance of responsibility, which further supports that Mother was not honest or transparent with her therapist. The challenged portions of adjudicatory findings 20, 23, and 24 pertaining to Mother's honesty in therapy are supported by clear, cogent, and convincing evidence.

### 3. *Refusal to Testify – Fifth Amendment*

Mother argues that her "refusal to testify cannot be the sole basis to terminate her parental rights" and cites to adjudicatory findings 15, 16, 18, 23, and 24 as support that the trial court's basis to terminate her parental rights was made "upon her refusal to testify."[3] Upon our review of the challenged findings, we note that they reference Mother's invocations of the Fifth Amendment at prior hearings, specifically relating to questions about "the acts of torture and physical abuse that the parents imposed on [Billy's] next oldest sibling . . . ." In *In re K.W.*, this Court explained that a parent may not invoke their Fifth Amendment right not to answer questions and then use that right as both a shield and sword in a civil proceeding:

---

[3] We note that adjudicatory finding 23 does not mention Mother's choice to invoke her Fifth Amendment right.

> [S]ince [m]other invoked her 5th Amendment right not to answer questions . . . , the trial court could infer that her answers would have been damaging to her claims . . . . Although mother had a right to assert her constitutional right not to answer, this proceeding is a civil case and she is not entitled to use the privilege against self-incrimination as both a "shield and a sword."

282 N.C. App. 283, 288, 871 S.E.2d 146, 151 (2022) (citation omitted). The trial court was permitted to draw an adverse inference against Mother for invoking the Fifth Amendment and the unchallenged findings of fact indicate that the trial court did not terminate Mother's parental rights solely because of her refusal to answer questions at prior hearings.

### 4. Grounds to Terminate Mother's Rights

Mother argues that the trial court committed reversible error by concluding that she (1) neglected Billy, specifically arguing that there is a lack of evidence to support that there was a probability of repetition of neglect; and (2) willfully left Billy in foster care for more than twelve months without showing to the satisfaction of the court that reasonable progress under the circumstances had been made in correcting the conditions which led to Billy's removal.

Pursuant to N.C. Gen. Stat. § 7B-1111(a)(1), the trial court may terminate a parent's parental rights upon finding that "[t]he parent has . . . neglected the juvenile[,]" as defined in N.C. Gen. Stat. § 7B-101. N.C. Gen. Stat. § 7B-1111(a)(1) (2023). In relevant part, a neglected juvenile is defined as one whose parent "[d]oes not provide proper care, supervision, or discipline" or "[c]reates or allows to be created

a living environment that is injurious to the juvenile's welfare." N.C. Gen. Stat. §§ 7B-101(15)(a), (15)(e) (2023).

Such "neglect must exist at the time of the termination hearing." *In re B.S.O.*, 234 N.C. App. 706, 714, 760 S.E.2d 59, 65 (2014) (quotation marks, brackets, and citation omitted). "[I]f the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re V.S.*, 380 N.C. 819, 822, 869 S.E.2d 698, 701 (2022) (quotation marks and citation omitted). This Court has expressly stated that "[a] parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re C.M.P.*, 254 N.C. App. 647, 655, 803 S.E.2d 853, 859 (2017) (citation omitted). Additionally, a parent's failure to "demonstrate that sustained behavioral change of the type necessary to ensure the [minor child's] safety and welfare" can support a conclusion that there is a likelihood of repetition of neglect. *See In re R.L.R.*, 381 N.C. 863, 875, 874 S.E.2d 579, 590 (2022).

Here, it is undisputed that Billy was previously adjudicated neglected. As to the likelihood of future neglect, the trial court made numerous supported findings of fact that Mother could continue to neglect Billy if he was returned to her care, including:

> 15. . . . .
>
> > b.(i)(3)  If the respondent parents could not admit and/or recognize the abuse and neglect they imposed on [Billy] and his older siblings, they were not able

to demonstrate to the [c]ourt that they understood the impact they have had on the juveniles and they were not able to demonstrate they have rehabilitated themselves and the circumstances that caused the abuse and neglect.

b.(i)(4)  The respondent parents had another child named [Penny] and they are residing together.  Both of them have expressed an intent to reunify with all the children as one family unit.  This intent demonstrates that Mother was not considering the best interest of all of the children, as she intended them to reunify with her significant other who this [c]ourt had found committed acts of physical and emotional abuse upon them, including torture upon [Sarah].

. . . .

16.  [M]other participated in DV services, mental health treatment and parenting.  However,

. . . .

b. Additionally, Mother failed to be transparent with her therapist and had not discussed with her therapist about the actions of abuse, torture, improper supervision and improper discipline that the respondent parents committed against [Billy] and his siblings, despite Mother indicating at the [permanency planning hearing] that she has been completely honest with her therapist.

. . . .

18.  At [the second permanency planning hearing], the [c]ourt ruled:

. . . .

b. That . . . the respondent parents were not . . . actively participating or cooperating with the plan, [DSS] and GAL.  They . . . were both acting in a manner inconsistent with the health and safety of the juvenile.

. . . .

20. As of the completion of this TPR hearing, Mother has demonstrated that she had employment and housing. She had engaged in mental health services, parenting classes, and DV services, but she failed to provide documentation/evidence that she has accepted the role she played in [Sarah's] abuse or the neglect she imposed on [Stephanie and Billy]. She failed to demonstrate to the [c]ourt that she understands the impact on [Billy] and failed to demonstrate that she has been able to rehabilitate herself from the circumstances that caused the neglect against [Billy]. Mother has not been forthcoming with her therapist. She also continues to engage with, and not protect herself from, Father [] despite a recent severe incident of domestic violence he perpetrated against her at her residence.

. . . .

23. The respondent parents have been separated from [Billy] for approximately two years—a long period of time. As noted above, [Billy] was adjudicated neglected on February 2, 2022. The neglect that led to the removal and adjudication created a substantial risk of harm to [Billy]. There is a likelihood of repetition of neglect in that there exists a substantial risk of harm to [Billy] if he were returned home, as demonstrated by the respondent parents' collective failure to accept responsibility for the conditions that led to the removal and adjudication which makes it impossible for this [c]ourt to know whether the respondent parents know their behavior was wrong and/or that they know (or have learned) how to change said behavior. Respondent parents' behavior was so egregious and severe that [Billy's] safety in their care cannot be ensured. [Billy] is currently 2 years old, is not potty trained, and likely to engage in bed wetting for a significant period of time which could result in the same heinous, cruel, and tortuous disciplinary measures taken by the respondent parents against [Sarah] for bed wetting. Additional factors the [c]ourt considered as it relates to willfulness and the creation of a substantial risk of harm for [Billy] are mother's voluntary decision not to be honest with her therapist about what led [Billy] to be taken into

[DSS] custody, mother's voluntary decision to continue contact with father after a recent severe domestic violence incident, and her failure to file for a DVPO after said incident all of which demonstrated a likelihood of mother not protecting [Billy] as she had not protected herself. . . .

24. [Mother] could have been, but made a voluntary decision to not be[,] honest and forthcoming with her therapist. . . . [S]he made a voluntary choice to continue contact with father by accepting his phone calls while he was in jail following the recent DV incident and not seek a DVPO after said incident despite having the ability to file a DVPO against him and serve him in jail. . . .

These supported findings of fact show that Mother failed to complete all of the components of her case plan, failed to acknowledge or accept responsibility for the reasons that Billy came into DSS custody, and failed to understand the role she played in Billy's neglect. These findings support the trial court's conclusion that there was a likelihood of future neglect by Mother. *See R.L.R.*, 381 N.C. at 875, 874 S.E.2d at 589 (determining that parents are "required to demonstrate acknowledgement and understanding of why the juvenile entered DSS custody as well as changed behaviors"); *see also In re M.S.E.*, 378 N.C. 40, 58-59, 859 S.E.2d 196, 210-11 (2021) (upholding ground of neglect in part based on the parent's inadequate engagement in remedial services and inability to understand the needs of their children).

Because the trial court's findings support its conclusions of law that there was a previous adjudication of neglect and a likelihood of future neglect if Billy was returned to Mother's care, the trial court did not err in determining that grounds existed to terminate Mother's parental rights under N.C. Gen. Stat. § 7B-1111(a)(1).

*See In re V.S.*, 380 N.C. at 822, 869 S.E.2d at 701.

"In termination of parental rights proceedings, the trial court's finding of any one of the enumerated grounds [in N.C. Gen. Stat. § 7B-1111(a)] is sufficient to support a termination." *In re N.T.U.*, 234 N.C. App. 722, 733, 760 S.E.2d 49, 57 (2014) (quotation marks, ellipsis, and citation omitted). Accordingly, we need not address the other ground for termination found by the trial court.

### 5. *Best Interest Determination*

Mother lastly argues that the trial court abused its discretion by terminating her parental rights because it was not in Billy's best interest to do so.

After an adjudication that one or more grounds exist to terminate parental rights under N.C. Gen. Stat. § 7B-1111, the trial court "proceeds to the dispositional stage." *In re A.U.D.*, 373 N.C. at 6, 832 S.E.2d at 700. The court shall determine whether it is in the juvenile's best interest to terminate parental rights by considering the following criteria:

> 1. The age of the juvenile.
>
> 2. The likelihood of adoption of the juvenile.
>
> 3. Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> 4. The bond between the juvenile and the parent.
>
> 5. The quality of the relationship between the juvenile and the proposed adoptive parent.
>
> 6. Any relevant consideration.

N.C. Gen. Stat. § 7B-1110(a) (2023). The trial court must make written findings of

the factors it considers to be relevant. *In re Z.A.M.*, 374 N.C. at 99, 839 S.E.2d at 799.

Here, the trial court made the following dispositional findings of fact:

> 1.  The Adjudicatory Findings of Fact are incorporated herein by reference as if fully set forth.
>
> 2.  [DSS] proffered live testimony from [the social worker]. The GAL proffered live testimony . . . and GAL Exhibit 1. GAL Exhibit 1 was the GAL's Termination of Parental Rights Report which was admitted into evidence without objection.
>
> 3.  The permanent plan in [Billy's] best interest is adoption. The parents having their parental rights is a barrier to adoption.
>
> 4.  [Billy] recently turned 2 years old. He has been in [DSS] custody since he was approximately one month old so he has been in custody almost his entire life.
>
> 5.  Terminating the respondent parents' parental rights will aid in the accomplishment of the permanent plan of adoption. Neither the family nor any other prospective adoptive home can adopt the juvenile unless the respondent parents consent to an adoption or their parental rights are terminated. The respondent parents have insufficient progress on addressing the removal conditions. Given that lack of progress, significant barriers to reunification remain. Therefore, the best option available for [Billy] is for him to be adopted which requires that the parental rights of the respondent parents be terminated.
>
> 6.  The Court has evidence that a bond exists between [Billy] and the respondent parents. However, the Court has no evidence of the type of bond that exist[s]. Specifically, whether it is strong or nurturing bond; or whether [Billy] even recognizes Mother and Father [] to be his parents. Additionally, Father [] has missed all his visits with [Billy] beginning July 6, 2023 through the date of the TPR hearing due to his incarceration for committing domestic violence against Mother.

7. It is not in [Billy's] best interest to keep him in [DSS] custody indefinitely for the respondent parents to have more time to show progress, to admit and/or recognize the neglect they imposed, to demonstrate to the Court that they understand the impact on [Billy], to demonstrate they have rehabilitated themselves and the circumstances that caused the neglect against [Billy], and/or to find an alternative placement for possible guardianship which is not the primary permanency plan.

8. It is in his best interest for [Billy] to obtain a safe, stable, and permanent home.

9. [Billy] has lived with his current foster family since January 12, 2022 so for approximately one year and nine months of his 2-year-old life. [Billy] has a strong, loving bond with his foster parents, as well as the biological children of the foster parents. [Billy] calls foster parents "mommy" and "daddy[,]" and he refers to the foster parents' biological children as "sister" and "brother." The quality of the relationship and care provided by the foster parents is excellent, as they ensure that all of [Billy's] physical, mental, emotional, and developmental needs are met. The foster parents provide positive and nurturing care to [Billy]. [Billy] is happy, nurtured[,] and loved by the foster parents.

10. The foster parents have expressed a desire to adopt [Billy] and have remained committed throughout the case to adopting [Billy] if he became legally cleared to do so.

11. The likelihood of [Billy] being adopted is very high.

12. Terminating the respondent parents' parental rights is in the juvenile's best interest.

Mother argues that dispositional finding 6 is not supported by the evidence because the trial court finds "no evidence of the type of bond existed between Billy and [Mother] despite the social worker testifying that a bond existed." The record evidence supports dispositional finding 6, as testimonial evidence shows that *a* bond

existed between Billy and Mother, but there is no evidence of the *type* of bond that existed, such as a strong or nurturing bond. The GAL report entered into evidence and the social worker's testimony merely show that Mother had "appropriate and positive interactions with [Billy] during supervised visits[,]" but they are otherwise completely silent as to the type and extent of the bond between Mother and Billy. There is additionally no evidence that Billy recognized Mother to be his parent. Finding 6 is thus supported by competent evidence.

Mother argues that dispositional finding 7 is not supported by the evidence because "Father . . . provided approved by Gaston County DSS placements of close family relatives," our General Statutes prefer relative placements over non-family members, and Father's mother and brother "were inappropriately excluded."

We first note that the trial court's unchallenged adjudicatory finding 22, incorporated by reference into its dispositional findings, supports dispositional finding 7. The trial court found:

> 22. As of the completion of this TPR hearing . . . [DSS] had already appropriately ruled out [Father's] proposed family members. Furthermore, this [c]ourt did not hear any evidence at this hearing that warranted reconsideration of [Father's] proposed family members. [Father's mother's] testimony confirmed that she allowed unauthorized contact between the parents and [Billy] against the [c]ourt's order. Additionally, [father's brother's] testimony at this hearing is not credible in that it is inconsistent with the [DSS social worker's] credible testimony during this hearing and with the [c]ourt's [prior] order.

Mother did not challenge adjudicatory finding 22, and it is thus binding on appeal.

*In re Z.L.W.*, 372 N.C. at 437, 831 S.E.2d at 65 (citations omitted). This finding demonstrates that the trial court considered the testimony from Father's mother and Father's brother offered during the TPR hearing and weighed the credibility of their testimony before deciding that it would not reconsider Father's mother or brother as possible relative placements. The dispositional finding 7 is supported by the competent evidence.

Moreover, our Supreme Court has consistently held that a trial court is not required to consider potential relative placements during the dispositional phase of a TPR proceeding. *See In re H.R.S.*, 380 N.C. 728, 736, 869 S.E.2d 655, 660 (2022) (explaining that the trial court is required to consider relative placements in the "initial abuse, neglect, and dependency stage of a juvenile proceeding" and "the trial court is not expressly directed to consider the availability of a relative placement" during the dispositional phase); *see also In re S.D.C.*, 373 N.C. 285, 289, 837 S.E.2d 854, 857 (2020).

The trial court properly considered all the relevant factors of N.C. Gen. Stat. § 7B-1110, and it was within the discretion of the trial court to decide how each factor should be weighed. *In re I.N.C.*, 374 N.C. 542, 550, 843 S.E.2d 214, 220 (2020). This Court may not "substitute our preferred weighing of the relevant statutory criteria for that of the trial court[.]" *Id.* at 550-51, 843 S.E.2d at 220. The trial court's conclusion that termination of Mother's parental rights was in Billy's best interest "was not manifestly unsupported by reason." *In re Z.L.W.*, 372 N.C. at 438, 831

S.E.2d at 66.

## C. Father's Appeal

Father's sole issue on appeal is that the trial court abused its discretion by terminating his parental rights without first making adequate findings of fact about two relatives offered as relative placements for Billy.

Father does not challenge any of the adjudicatory findings of fact and challenges only the portion of dispositional finding 7 pertaining to alternative placement for possible guardianship for Billy. The dispositional finding 7 states:

> 7. It is not in [Billy's] best interest to keep him in [DSS] custody indefinitely for the respondent parents to have more time to show progress, to admit and/or recognize the neglect they imposed, to demonstrate to the [c]ourt that understand the impact on [Billy], to demonstrate they have rehabilitated themselves and the circumstances that caused the neglect against [Billy], and/or to find an alternative placement for possible guardianship which is not the primary permanency plan.

We first note that the trial court's unchallenged adjudicatory finding 22, incorporated into its dispositional findings, supports dispositional finding 7. The trial court found:

> 22. As of the completion of this TPR hearing . . . [DSS] had already appropriately ruled out [Father's] proposed family members. Furthermore, this [c]ourt did not hear any evidence at this hearing that warranted reconsideration of [Father's] proposed family members. [Father's mother's] testimony confirmed that she allowed unauthorized contact between the parents and [Billy] against the [c]ourt's order. Additionally, [father's brother's] testimony at this hearing is not credible in that it is inconsistent with

the [DSS social worker's] credible testimony during this hearing and with the [c]ourt's [prior] order.

Father did not challenge adjudicatory finding 22, and it is thus binding on appeal. *In re Z.L.W.*, 372 N.C. at 437, 831 S.E.2d at 65 (citations omitted). This finding demonstrates that the trial court considered the testimony from Father's mother and Father's brother offered during the TPR hearing and weighed the credibility of their testimony before deciding that it would not reconsider Father's mother or brother as possible relative placements. The dispositional finding 7 is supported by the evidence.

Moreover, our Supreme Court has consistently held that a trial court is not required to consider potential relative placements during the dispositional phase of a TPR proceeding. *See In re H.R.S.*, 380 N.C. at 736, 869 S.E.2d at 660 (explaining that the trial court is required to consider relative placements in the "initial abuse, neglect, and dependency stage of a juvenile proceeding" and "the trial court is not expressly directed to consider the availability of a relative placement" during the dispositional phase); *see also In re S.D.C.*, 373 N.C. at 289, 837 S.E.2d at 857.

The trial court properly considered all the relevant factors of N.C. Gen. Stat. § 7B-1110, and it was entirely within the discretion of the trial court to decide how each factor should be weighed. *In re I.N.C.*, 374 N.C. at 550, 843 S.E.2d at 220. This Court may not "substitute our preferred weighing of the relevant statutory criteria for that of the trial court[.]" *Id.* at 550-51, 843 S.E.2d at 220. The trial court's

determination that termination of Father's parental rights was in Billy's best interest "was not manifestly unsupported by reason." *In re Z.L.W.*, 372 N.C. at 438, 831 S.E.2d at 66.

### III.     Conclusion

The trial court's adjudicatory findings of fact are supported by clear, cogent, and convincing evidence, which in turn support the trial court's conclusion of law that Billy was a neglected juvenile. The trial court did not abuse its discretion in concluding that termination of Mother and Father's parental rights was in Billy's best interest. Accordingly, we affirm the trial court's order terminating Mother and Father's parental rights.

AFFIRMED.

Judges ARROWOOD and WOOD concur.